652 N.W.2d 912 (2002)
2002 ND 178
In the Matter of the ADOPTION OF S.A.L., a Minor Child.
K.E.L., Petitioner and Appellee
v.
S.S.M., a minor child, C.L., his mother, Carol K. Olson, Executive Director of the North Dakota Department of Human Services, Respondents,
D.B.M., his putative father, Respondent and Appellant.
No. 20020027.
Supreme Court of North Dakota.
November 5, 2002.
*914 Mary E. Nordsven, Hardy, Maus & Nordsven, P.C., Dickinson, for petitioner and appellee.
Eugene F. Buresh, Dickinson, for respondent and appellant.
SANDSTROM, Justice.
[¶ 1] D.B.M. appeals from a Southwest Judicial District Court judgment terminating his parental rights to S.A.L., formerly known as S.S.M., concluding he abandoned his child, the child was deprived, and it was in the best interest of the child to grant a petition for adoption by S.A.L.'s stepfather, K.E.L. We affirm, concluding the district court properly denied D.B.M.'s last-minute request for court-appointed counsel, and the evidence supports the termination of D.B.M.'s parental rights.

I
[¶ 2] D.B.M. and C.L. are the biological parents of S.A.L., a minor child born in October 1991. They were never married but cohabited during the months of December 1990 and January 1991. During their time together, D.B.M. was arrested in the State of Nevada for sexual assault, kidnapping, attempted murder, and robbery. While C.L. was pregnant, a jury convicted D.B.M. of sexual assault and kidnapping and sentenced him to serve two consecutive life terms at the Lovelock Correctional Center in Lovelock, Nevada. He was acquitted on the counts of attempted murder and robbery. While incarcerated in the State of Nevada, D.B.M. has violated prison rules and has admitted to past use of controlled substances. It is unlikely he will be paroled before S.A.L. reaches the age of majority.
[¶ 3] C.L. and D.B.M. communicated occasionally during S.A.L.'s first three years, and D.B.M. sent two gifts to C.L. for the child. There had been no communication between D.B.M. and C.L. for approximately five years until D.B.M. sent a letter to C.L.'s mother, making no mention of the child. D.B.M. has never seen or talked to the child and has never developed any type of parent-child bond or relationship. D.B.M. has never paid any financial support.
[¶ 4] On March 31, 1997, C.L. married K.E.L., who has known S.A.L. since the child was three and has supported him since he was four. The child has resided with C.L. and K.E.L. since their marriage.
[¶ 5] D.B.M. was advised of his right to counsel in the summons personally served upon him in December of 2000. The court notified D.B.M. of his right to court-appointed counsel in its January 26, 2001, order for continuance. D.B.M. filed, on his own behalf, an opposition to petition for termination of parental rights, discovery documents, and various motions. In a September 20, 2001, memorandum opinion, the court again informed D.B.M. of his right to counsel, encouraging him to apply and pointing out that the court files contained numerous examples of D.B.M.'s unfamiliarity with North Dakota law and court procedures.
[¶ 6] Six days before the hearing, D.B.M. mailed an application for counsel. The application, however, was not received by either the trial judge or the opposing counsel prior to the January 9, 2002, hearing. At the hearing, D.B.M. appeared telephonically and orally requested to be represented by counsel. The court denied the request, and D.B.M. represented himself. Under N.D.C.C. § 14-15-19(3)(a)-(c), the district court terminated D.B.M.'s parental rights. The district court said there was no doubt D.B.M. was entitled to court-appointed counsel, but denied his request because it was untimely. The district court held D.B.M.'s delay was an *915 effective waiver of his right to counsel under State v. Dvorak, 2000 ND 6, ¶ 15, 604 N.W.2d 445.
[¶ 7] D.B.M. appeals, represented by counsel, arguing the trial court's failure to appoint counsel violated his rights under N.D.C.C. § 14-15-06 and under article I, section 21, of the North Dakota Constitution.
[¶ 8] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 27-05-06, 27-20-44, and 14-15-19. This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 29-28-06.

II
[¶ 9] Whether the district court's non-appointment of counsel violated D.B.M.'s due process rights is a constitutional question. In reviewing a district court's denial of a request for appointed counsel, we inquire whether the district court acted arbitrarily, unconscionably, or unreasonably. State v. DuPaul, 527 N.W.2d 238, 240 (N.D.1995).
[¶ 10] A parent's relationship with a biological child is entitled to constitutional protection, but that relationship is neither absolute nor unconditional. See, e.g., Santosky v. Kramer, 455 U.S. 745, 747-48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Lassiter v. Dep't of Social Services, 452 U.S. 18, 26-27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); Adoption of K.A.S., 499 N.W.2d 558, 567 (N.D.1993). A court, however, cannot irrevocably sever a parent's relationship with a biological child without first granting the parent certain procedural protections afforded by due process. See, e.g., Santosky, at 747-48, 102 S.Ct. 1388; Lassiter, at 24-25, 101 S.Ct. 2153. An incarcerated parent's due process rights are generally satisfied if the "prisoner is represented at the termination hearing by counsel and has an opportunity to appear by deposition or other discovery technique." Adoption of J.W.M., 532 N.W.2d 372, 376 (N.D.1995).
[¶ 11] However, "the very nature of procedural due process `negates the concept of inflexible procedures universally applicable to every imaginable situation; instead, the requirements imposed by [due process] are flexible and variable and dependent upon the particular situation being examined.'" Id. at 376-77 (quoting Jensen v. Satran, 332 N.W.2d 222, 227 (N.D.1983)). The United States Supreme Court held in Mathews v. Eldridge that procedural due process must be analyzed under a balancing test, which:
generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
[¶ 12] In Santosky and Lassiter, the United States Supreme Court expanded the flexible contours of procedural due process in termination of parental rights after analyzing each case under the Eldridge balancing test. Santosky, 455 U.S. at 758, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. In Santosky, the Court held due process requires any allegations against the parent be supported by at least clear and convincing evidence before a state can sever parental rights. Santosky, at 769, 102 S.Ct. 1388. Such a *916 heightened standard of proof is needed to avoid factual determination errors. Id.
[¶ 13] In Lassiter, the Court considered whether the federal due process clause required appointment of counsel for indigent parents in every parental termination proceeding. Lassiter, 452 U.S. at 31, 101 S.Ct. 2153. The Court balanced the Eldridge factors against each other and against the presumption that an indigent litigant is entitled to appointed counsel only in cases in which deprivation of physical liberty is involved. Id. In Lassiter, the Court held that the Constitution does not mandate the appointment of counsel for indigent parents in every proceeding to terminate parental rights. Id. at 32, 101 S.Ct. 2153. Instead, under the federal due process clause, a district court, in the exercise of sound judicial discretion and subject to review on appeal, must decide whether, under the circumstances of the case, due process requires the appointment of counsel for an indigent parent. Id.
[¶ 14] D.B.M. argues his state equal protection rights have been violated. Under North Dakota law, involuntary termination of parental rights may be accomplished under three separate provisions: (1) the Uniform Juvenile Court Act (see N.D.C.C. § 27-20-45); (2) the Uniform Parentage Act (see N.D.C.C. § 14-17-24); or (3) the Revised Uniform Adoption Act (see N.D.C.C. § 14-15-19). Under the Revised Uniform Adoption Act, which applies to this case:
parental rights may be terminated if any ground exists for termination under the Juvenile Court Act or the Parentage Act; if the child has been abandoned by the parent; if the child is suffering or probably will suffer serious harm because of the misconduct, faults, habits, or physical or mental incapacity of the parent; or, if the parent who does not have custody of the child unreasonably withholds consent to the termination, contrary to the best interests of the child.
Adoption of K.A.S., 499 N.W.2d 558, 560-61 (N.D.1993).
[¶ 15] This Court has recognized that our state constitution grants rights to parents in termination proceedings that are broader than the rights granted under the federal constitution. See, e.g., K.A.S., 499 N.W.2d at 563. Under N.D.C.C. § 14-15-19(6), in a proceeding under the Revised Uniform Adoption Act, our equal protection provision requires appointment of counsel for an indigent parent who faces termination of parental rights. Id. at 563. However, "[i]f the trial court determines that the party is indigent, the court must appoint counsel to represent that person, unless the right is waived." Id. at 567 (emphasis added).
[¶ 16] We have not adopted a standard for determining waiver of counsel in the context of parental termination cases. Waiver of counsel in criminal cases, however, may provide helpful guidance in evaluating the validity of a waiver in a parental rights termination proceeding. In comparing parental termination cases to criminal cases, this Court has noted that the serious threat to a fundamental interest of a parent is not so different from the serious threat to the physical liberty of a criminal defendant. K.A.S., 499 N.W.2d at 563.
[¶ 17] Under our criminal caselaw, defendants who represent themselves must voluntarily, knowingly, and intelligently relinquish the benefits of counsel. State v. Dvorak, 2000 ND 6, ¶ 10, 604 N.W.2d 445. Whether a defendant's waiver of the right to counsel was knowing and intelligent depends on the facts and circumstances of each case. State v. Harmon, *917 1997 ND 233, ¶ 22, 575 N.W.2d 635. To intelligently and knowingly choose self-representation, a defendant should be aware of the dangers and disadvantages of proceeding without the skill and experience of counsel. Dvorak, at ¶ 10. The record must establish that the choice was made "with eyes open." Id. (citing Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)).
[¶ 18] A defendant need not make unequivocal statements indicating a voluntary desire for self-representation. Harmon, 1997 ND 233, ¶¶ 15, 21, 575 N.W.2d 635. The defendant's conduct may be the functional equivalent of a voluntary waiver of the right to counsel. Id. at ¶ 15. We have concluded that a manipulative pattern of obstructing the legal process is the functional equivalent of a voluntary waiver of right to counsel. Dvorak, 2000 ND 6, ¶ 15, 604 N.W.2d 445.
[¶ 19] D.B.M.'s actions were a functional equivalent of a voluntary waiver. In August 2001, eight months after having been admonished by the district court in its January 2001 memorandum opinion for not being familiar with North Dakota law and court procedures, D.B.M. continued to represent himself. D.B.M. continued to file numerous documents with the court and did not mail an application for counsel until six days before the hearing. D.B.M.'s late request and prior actions give the appearance of manipulation to delay the hearing and obstruct the legal process. D.B.M.'s excuse that he did not have time to use the prison library is not persuasive. The forms for appointment of counsel sent to D.B.M. in January 2001 did not require library assistance to complete. Even if D.B.M. believed he needed library assistance, it is not plausible that he could not have found time to use the prison library during the entire year prior to the hearing. D.B.M. also claimed he could not request counsel because he was dealing with another appeal. That D.B.M. had another pending appeal is more reason to conclude he had knowledge that a timely application for counsel would better serve his interests in this civil case.
[¶ 20] We next analyze the record, facts, and circumstances of each case to determine whether the functional waiver was knowing and intelligent. Dvorak, 2000 ND 6, ¶ 16, 604 N.W.2d 445. The district court not only sent D.B.M. an application and twice advised him of his right to counsel, but went further and admonished him in its September 20, 2001, memorandum opinion, stating:
[D.B.M.] is not even on the same page as the Court or other parties in this proceeding. [D.B.M.] has been applying the federal rules of procedure which is completely inappropriate. This action is a state court action that will be decided according to North Dakota laws and court rules and procedures. The Court rejects [D.B.M.'s] contention that petitioner has somehow stipulated or agreed that federal law and the federal rules of procedure would apply to this case. In order to put to rest any doubt in this area the Court hereby ADMONISHES and advises [D.B.M.] that North Dakota law and the North Dakota rules of court apply to this proceeding. It is inappropriate to rely on federal law or federal rules of procedure or to argue that they are determinative in this case.
....
The Court in its order dated January 26, 2001, informed [D.B.M.] of his right to counsel under North Dakota law, including his right to court appointed counsel, and instructed that an application be sent to [D.B.M.] by the clerk of court. Despite this information, no application *918 for counsel has ever been received from [D.B.M.].
In the event there has been some misunderstanding, the Court reiterates that [D.B.M.] has a right to be represented by counsel in this proceeding, including court appointed counsel if he is indigent. (It appears obvious that [D.B.M.] is indigent.) See N.D.C.C. § 14-15-19.1.
....
[D.B.M.] has demanded a jury trial. Assuming [D.B.M.] was serious about his request, it is difficult to understand how [D.B.M.] would conduct such a jury trial representing himself. First of all, [D.B.M.] would be unfamiliar with court procedures. Second, [D.B.M.] would not be physically present, making it difficult to conduct such a trial over the phone. If [D.B.M.] was indeed serious about his request and not filing such a demand for the purpose of harassment or delay, would he not want the assistance of local counsel?
[¶ 21] The district court concluded, "In addition, the Court as outlined above, again advises the Respondent, [D.B.M.], of his right to counsel and strongly encourages him to take advantage of the same." D.B.M. was fully aware of his right to court-appointed counsel and was warned of the dangers and disadvantages in representing himself. When D.B.M. decided to continue to represent himself, he did so knowingly and intelligently.
[¶ 22] The district court did not abuse its discretion by denying D.B.M.'s motion for court-appointed counsel. A review of the district court record makes clear that D.B.M. was fully aware of his right to court-appointed counsel, understood the dangers and disadvantages of self-representation, and proceeded with eyes wide open. The district court did not act arbitrarily, unconscionably, or unreasonably. Under these circumstances, the district court did not refuse D.B.M. court-appointed counsel; rather, the district court properly held his motion was untimely and concluded he voluntarily and knowingly waived his right.

III
[¶ 23] The district court's judgment terminating D.B.M.'s parental rights to S.A.L. is affirmed.
[¶ 24] VANDEWALLE, C.J., and NEUMANN, MARING and KAPSNER, JJ., concur.